Next case is Sistore Companies v. Secretary of Defense, 2009-1379. Mr. Phillips. Please proceed. The red brief would have it, page 11, that issues of causation, foreseeability, and proof of damage to a reasonable certainty are issues of fact, citing Fifth Third. Fifth Third was a Winstar case, not a contract disputes act case. And this is a contract disputes act case. And in contract disputes act cases, as this one, determinations on damages are questions of law, not questions of fact. We cite it to P.J. Dick, and P.J. Dick holds an agency board interpretation of the test for proving entitlement are indeed questions of law, which are reviewed here at ENOVA. But the board found that you didn't suffer any damages because of what the government did, right? You didn't prove any lost profits? Yes, that's correct. In doing so, the board wrongly imposed on Sistore the burden of imprecision. When, in fact, the difficulties identified by the board are the creation of the value added license agreement, the broken contract, that were determined solely by the defense department, not by Sistore. The board found Appellant's lost profit claim to be speculative and without credible financial factual support because, among other things, Sistore lacked a job cost accounting system. Well, the contract didn't require any accounting system whatsoever. And Sistore was a small business that delivered electronic commerce and didn't have a job cost accounting system. This predecessor court has never held that lack of a job cost accounting system renders an expectancy damages claim speculative unless it was required by the contract. And this contract didn't require it. Isn't your strongest argument that there was a breach? There was a clear breach. There was a found breach, yes. And the risk of proving damages relies on the breacher. The risk of avoiding damages, the imprecision, as you stated it before, rests at the expense of the breacher. And that's just my point. The board tacked that burden on Sistore and it did so wrongly. The other problem here really comes down to a causation problem. The board would have it that the small number of trading parties actually conducting electronic commerce was an intervening cause of the lost profits damages that Sistore is seeking. But there's no proof that this intervening cause was not itself caused by the breach. Well, what would you have the board award you? If I'm remembering correctly, you started out with a really big number. Yes, we did. Which obviously had little basis. What actual evidence is there that would justify a particular result that you would urge? All the evidence in this case is based upon documents generated by the Defense Department, with a few minor exceptions. The period of damages was set by the board, so the damages had been recalculated to fit that period. The market share data was developed by Sistore's expert, but there is an underlying document prepared by DOD that shows the market that actually occurred. Sistore had approximately an 8% share. And Sistore is asking for a 12% share of whatever that market is. Now, yes, there's imprecision as to what the market would have been. That's admitted, not challenged. But that imprecision is not Sistore's fault. The government could have kept records of the trading partners that were actually conducting electronic commerce, but the government never kept those records. So they're not available. So we have to look as best we can to the reports generated, principally by the DOD Inspector General, to have an idea of what the market would be. And that's exactly what we did. On what basis in the record do you conclude that the damages claim that your client is making is not speculative? It is not speculative because, among other things, he actually had an 8% share of the market as it was. He actually had revenue, although a very small amount of revenue, because of DOD's failure to impose this as a mandatory system, which is in fact what the contract required. So that's the basis. It's not speculation. The man did enjoy profits. Our expert testified, if you backed out his development expenses, this would have been a profitable enterprise, even as it was. Does the record show that there were several other factors that led to the failure of this market to expand? The cost of implementing this, the fact that it didn't work very well, and other things? Those were found by the board to be the reason why the damages were speculative. In the law developed by this circuit, those are intervening causes. But this circuit says, and it said most recently in Cary, that the intervening cause has to be independent of the actions of the party making the breach. Cary was that cedar fire in San Diego, and that was a lost hunter who lit a signal fire. But in this case, there was no proof whatsoever that the small number of DOD trading partners was not related to the fact that this was not imposed as a mandatory system. And on that, you can't say it's an intervening cause that excuses the breach. That's just simply wrong as a matter of law. What's the standard of review on damage questions from the board? De novo. De novo? De novo. Not fact? No, not fact. Substantial evidence? Pardon? Substantial evidence? No, it's a question of law reviewed here de novo. That's P.J. Dick versus Principi, 324, Fed 3rd, 1364, 1370, cited in the blue brief. So that's, no, this is de novo review. We don't challenge the facts. We challenge the board's rulings on causation, foreseeability, and proof of damages to a reasonable certainty. And those are not facts. Those are questions of law. Shall we save the rest of your time for rebuttal? Thank you, yes. Mr. Palmer. May it please the court. This court should affirm the board's decision because the board's holding that Sistar failed to establish causation and failed to prove its damages with a reasonable certainty are supported by substantial evidence. Appellant's counsel is simply wrong that the review of an award or non-award of damages is a question of law.  And nowhere, as a matter of fact, in that case that the appellant relies upon, P.J. Dick, does it state otherwise. In fact, in reviewing that page, nowhere does the language on page 1370 of the P.J. Dick case state the sentence for which it was cited. Rather, the case simply indicates that the Federal Circuit reviews a board's interpretation of a contract de novo. The decision goes on then to state that a board's interpretation of the test for proving entitlement to ICLEI damages presents a question of law that we review de novo. A board's decision with respect to the underlying facts related to those legal tests shall be upheld unless we conclude they are not supported by substantial evidence. So the question in this appeal is whether or not the board's holdings that Sistar failed to prove its damages by preponderance of the evidence is supported by substantial evidence. But there was a breach, right? Absolutely, there was a breach. There were simply no lost profits damages resulting from that breach. Sistar's claim is based upon a number of key assumptions, including an assumption that absolutely No lost profit damages resulting from the breach. I can understand your argument that you don't think they proved it without speculation, but to actually stand up and say there were none, that seems a little bit broad. You're right. If I said that, I misspoke. What I meant to say is that Sistar was unable to show below, by preponderance of the evidence, any lost profits damages. So I won't sit up here and say absolutely not categorically there were no damages whatsoever, but Sistar of course had the burden below. But they had an 8% market share. That's factually incorrect as well. The board indeed found that Sistar's market share during the relevant breach period was declining. In October of 1996, Sistar had a 9.4% market share, but in August of 1997, Sistar had only a 3.1% market share. Sistar experienced many customer complaints. But that's not a matter of a lack of proof. That's a matter of sort of choosing what the percentage ought to be going forward. I mean, recognizing the decline, fine. Let's not give them 8%. Let's give them 3%, or maybe the decline was a glitch. But in either event, those are solid, real numbers. And why in the face of those numbers should the lower court conclude that damages are just too speculative? And we get cases like this all the time where people's market share is declining and we have to – damage awards have to be assessed and courts routinely do assess damage awards. I mean, that is not so imprecise as to make it impossible to assess damages. That's correct, Your Honor, but there are a number of reasons why Sistar's damages in this case are imprecise. The first of which is that Sistar failed to establish any causation, any connection between the breach and damages. But that's a separate topic. The more direct answer to your question is that that 3.1% figure assumes that there would have been a market absent the government's breach. And, in fact, the Board found that the only credible evidence of any market that resulted from the government's breach consisted of only 927 vendors. Sistar claimed a lost market of 198,000 vendors, but the Board found that evidence to be not credible. Well, if the government hadn't breached, then what would the universe look like? If the government hadn't breached, what would the government have been required to do? The government would have been required to require vendors to engage in electronic commerce. To register through a van. Through a licensed van. In order to engage in electronic commerce. That's correct. The government did not do that in one instance, and that was the DLA's DASC system. And within that system, there were only 927 vendors. So there's only one instance where the government conducted electronic commerce but didn't require the people who it conducted it with to have pre-registered through a van. To have conducted the electronic commerce through a licensed van. That's correct. Below, the plaintiff established only one instance, only one system, outside FACNA, in which the government allowed vendors to engage in electronic commerce without going through licensed vans. And the amount of vendors who did that was a mere 927. But even that 927 figure is not an appropriate figure to use for the lost market size because Systor was a van within that system. Systor was competing even for those 927 vans. So the effective or practical market size. So even then, why wouldn't your argument be that they get 3% of 927?  It's still a number. My problem isn't, you know, my problem is the notion that it was so speculative that they get nothing. But why wouldn't your argument be that these are the numbers and this is all they're entitled to? Well, there are a number of reasons. The first is the one I alluded to just now, which is Systor didn't lose the opportunity to compete for those 927 vendors as a result of the government's breach. Systor was already competing for them and for their business outside the FACNA. No, no, no. But the government was required to make them register through a van in order to participate in electronic commerce by the contract. And once the government acquiesces and says, eh, we're not going to make you register, how is Systor going to somehow convince them of the merits of registering when the government has now acquiesced and said you don't have to register? Why would these companies now give Systor $150 a piece to register? They don't have to. There's no point to it. Well, I think there are two separate issues within your question, Judge Moore. The first is there were actually two breaches found in this case. And the first was the government did not require vendors to engage in electronic commerce through a licensed van. The second breach was that the government didn't require all vendors to register within the central contractor registration. Those are two separate breaches that might present two separate sets of damages. With respect to failing to require contractors to register within the central contractor registration, the board simply found that there were no damages because in that event, Systor did register every one of its clients, every one of the clients that it had, and therefore it obtained the fees associated with registering its own vendors. And Systor Below failed to simply prove any other damages that might have resulted from failing to register contractors within the CCR. With respect to breaching the breach regarding failing to require vendors to engage in electronic commerce through a licensed van, there are all sorts of reasons why any damages there would have been speculative. Even if we say, which the government does not concede, that there would have been a market of 927 vendors, then you have to look at what the market share was, which may have been somewhere in the neighborhood of 3.1 percent. But then you've got to look at what Systor would have generated, the amount of revenue that Systor would have generated from that 3.1 percent market share. Systor was unable to prove below the amount of revenue that it would have been able to generate. The reason is because Systor did not maintain any job cost accounting system. Now, Systor is correct that the license agreement didn't require a job cost accounting system. That's correct. However, the fact that Systor did not do that is fatal to its lost profits claim here because it cannot establish with any reasonable certainty the amount of revenue it generated from its FACMED clients. Then once you've determined, which you can't, the amount of revenue Systor would have generated, you have to look at what the profitability would have been. Obviously, Systor would have had costs associated with those revenues. Systor claimed a 27.7 percent profit rate, but that is belied by Systor's own actual five-year profit rate of 2.1 percent. Well, isn't that because there were a lot of up-front developmental costs in getting all of this working, which wouldn't have existed for subsequent clients? Not necessarily. Systor was a van long before it began to participate in the FACMED, long before it signed the license agreement with the government. It was already operating as a van, and presumably it would have already covered its startup expenses. Once you go through each one of those items and attack, as the Board did, very thoughtfully and with substantial evidence, each one of the assumptions that Systor's claim is based upon, it becomes quite clear that it is speculative. And that only goes to the issue of proving its damages with reasonable certainty. Then you have to address whether or not there was causation. And the Board's holding that Systor failed to establish causation was likewise supported by substantial evidence. There were a number of reasons why the FACMED didn't simply work as the parties expected it to. For example, the costs associated with conducting electronic commerce within the FACMED were prohibitive for many vendors. Many vendors were not aware of the FACMED. The FACMED was unsuitable for some vendors. Even under the licensing agreement between the government and Systor, outside vendors still retained the right to conduct business with the government by non-electronic means, in other words, by traditional means. So there were a whole host of reasons why the FACMED didn't work as expected, and reasons why, therefore, Systor was unable to generate any profits within the FACMED. And none of those reasons relate to the government's breach. The Board's holdings are simply supported by substantial evidence. Systor does not attack the individual facts upon which the Board based its holding. Therefore, Systor's argument must fail. Unless there are any further questions from the judges, I will close. Thank you, Mr. Palmer. Mr. Phillips has some rebuttals. One of the breaches here, as found by the Board, was that the Defense Logistics Agency did not become a part of this system, as was planned in the process action team report, which also reported, by the way, that there were some 50,000 vendors participating in the Defense Logistics Agency procurements, not necessarily the electronic procurements, but there were some 50,000. Let's talk about the 927 vendors in the DLA Electronic Commerce System that was operated outside. Yes, it was 927. That was a breach. Yes, Systor participated in that system, but there's another fact here, and the other fact here is there's another breach on top of that, a breach perpetrated by DLA. That breach was the fact that DLA operated, in addition to this Defense Automated Addressing System, DASC, operated electronic bulletin boards at its supply centers, Defense Electronic Supply Center, Defense General Supply Center, Defense Construction Supply Center, Defense Personnel Support Center. Those systems were also breaches of the VAM license agreement. Those breaches took away the vendors that would have been participating in the electronic commerce system. So there's actually here two breaches. 927 is evidence of nothing. It is simply another artifact of the Defense Department's breach. Let's talk about profit rate. The profit rate that we've been alluding to, yes, there was approximately a 3% profit rate for the companies that signed the VAM license agreement, and all of those companies experienced the same breach that Sistori experienced. That profit rate is a reflection of the breach as much as anything else. One company that did not sign the VAM license agreement and operated an electronic commerce system was Sterling Commerce. This is evidence before the board. Sterling Commerce's profit rate for the same period was 30%, not 3%. And that was considered by Sistori's expert when he calculated what the expectancy damages would have been had there not been a breach. Thank you. Thank you, Mr. Phillips. The case will be taken under review.